The next case, number 24-1200, United States v. Sean O'Donovan. At this time, would counsel for the appellant please introduce himself on the record to begin. Good morning, your honors. Martin Weinberg on behalf of appellant Sean O'Donovan, I would ask to reserve two minutes. You may. And I intend to address amongst the issues that have been briefed, the interstate wire issue that is relevant to the two honor services, counts one and two, and the entrapment issue and whether or not the denial of an entrapment issue requires a new trial on all three counts. In terms of the interstate wire issue, the wire fraud statute requires that the government prove beyond a reasonable doubt that the wire transmission traveled in interstate commerce, meaning that it crossed state lines. The government conceded that at trial. The court instructed that twice. The government argues as to a single text message, one in April, one in September, that the mere fact that there is evidence that it traveled or was transmitted on the internet through servers by itself satisfies its burden of proof, even though as to each of these wires, the sender was in Massachusetts, the receiver was in Massachusetts. It's akin to an argument that if I took out an iPhone, texted a five or six word text to one of your honors, if your honor had an iPhone, a fact witness could testify to that, not an expert, and that that by itself would satisfy the wire fraud interstate element. The government relies on a set of precedents from this circuit as their principal argument why that's sufficient. Why the single fact that a non-expert witness testified that if it goes over the internet, that's sufficient to establish the in-commerce interstate crossing the state element. And I contend that those precedents relied on. The Lewis, Hilton, Carroll, and additional cases cited by my brother in the notice of supplemental authority several days ago are distinguishable. They're distinguishable by context. In our case, we know we have a single text rather than in all of the other cases, multiple images, sometimes seven in Lewis, ten in Hilton, hundreds, thousands in some of the cases where the notice of supplemental authority is granted. Second, in our case, we have a single text from mass to mass, where in the other cases there is hard evidence of the use, for instance, in three of the five precedents of a peer-to-peer share. I understand them, but the cases themselves just say, Lewis just says, if it's transmitted in interstate commerce, that's sufficient. In Lewis, I know it's a child pornography case, but it talks about 1343, has the same textual language. So these are all distinctions. I understand them, but what do we do where we haven't made those distinctions the fulcrum of the case? We've just said in a very black letter way, this is what the rule is. I think the context of this case is so distinguishable from those that your honors have a principled predicate to distinguish the child pornography cases. Many of them are lime wire, hundreds of transmissions, images. We have some evidence in the Lewis case to what happens on the internet as you break down the data. How do we know that matters? I guess that's the point. So to those cases, I understand those are differences, but how do we know when the court just says something in a black letter statement, how do we know all those things you're telling us make any difference? Shouldn't we just go on what the court said the rule is? I think it's so counterintuitive in the context of a single text. And that's why I used the example of 10 yards. And if the went over the internet, we've extinguished the difference between using an instrumentality of interstate commerce. The theory of Lewis is you can't really tell where something goes once it goes on the internet. That seems to be the underlying theory of Lewis. Why is that limited to whether it's one text or many texts? Well, I think just in terms of probability, in terms of sufficiency of a jury to be able to make an assessment of beyond a reasonable doubt, it's different when you're using programs with no geographical boundaries where you have no evidence where the senders, where the receivers are sending from. Where in our case, we know we have a single text, minimal data, and if it went in a straight line, it would go interstate rather than interstate. And in many of those cases, you have expert testimony. In ours, the jury had none. We also have the alternative that the testimony that was received and admitted by Judge Young after striking the Apple witness and excluding the documents from Apple, the government certainly thought they had an obligation to prove it went out of state by calling someone from Apple to establish servers were out of state. But instead, they relied on an FBI agent whose testimony was not as an expert. He was not noticed as an expert, but as a lay witness who had no personal knowledge of what he testified to. On cross-examination, he admitted it was some unidentified trainer at some unidentified training site. Could have been years ago. The government says you forfeited that objection. Can you just respond to that? The personal knowledge objection to the FBI witness. Yeah, I mean, I did identify 702, but the flip side of 702, if it's not an expert and it's a lay witness, you need personal knowledge. And when you look at the cross-examination, which mirrored the cross-examination that led to the striking of the Apple witness, it was so clear the cross-exam was a combination of hearsay, but mostly... Under Lewis, do you need any witness? Lewis has an expert witness, and the court didn't address whether or not you needed any quality of evidence. But for a jury, you need some evidence, and here they have evidence from somebody... I guess what I'm asking is whether Lewis, given its rationale, because it just would go to the harmlessness of the evidentiary problem that you're asserting. If Lewis's theory is, if there's evidence that it traveled in this way, with then automatically its interstate commerce, you don't need a witness to say anything about how the internet works. You just have to say there was a text message or I went on the computer, that's enough. And there was evidence of that. So is that a wrong reading of Lewis? A, I contend that the only evidence that went over the internet came from Special Agent Davis, and he didn't know. He had no personal knowledge. He was relying on an untrustworthy, unidentified source. It should be expert testimony as to how data travels. I guess what I'm saying, just simple thing, government enters evidence that I sent an email to a friend, and they don't put on any witness. Under Lewis, is that enough or not? Lewis doesn't address whether or not you can just assume it. It talks a little about judicial notice and decides it doesn't need to resolve whether it's an adjudicative fact that could be subject to judicial notice. If your challenge is preserved as to this witness, then there would be, in your view, evidentiary area, and that wouldn't be controlled by Lewis anyway. Yes. Some evidence is necessary in a way like Fernandez 2, where everyone might assume Puerto Rico got more than $10,000 of benefits, but a jury's entitled to an evidentiary basis here. But for Davis, there was no evidentiary basis that an iMessage travels over the internet. It came exclusively from Davis, and he didn't have a trustworthy basis. His testimony should have been stricken, which would have left the record completely devoid of any evidence to satisfy the interstate element, even if Lewis and the other cases allowed this axiom that if it goes over the internet, that's sufficient. There have been other cases in other circuits since our decisions in Lewis and Carroll. Yes. Some support Lewis. Some follow Lewis. In the 10th Circuit, there is a decision cited in our brief, and another one from the 5th Circuit, although I think there's conflicting circuit decisions in the 5th, saying Lewis is wrong and you need evidence. When I get up again, I'll give you the page site on those conflicting circuits, Your Honor. Lewis and Carroll collectively seem almost like judicial notice. They almost say that it's on the internet, it's interstate. If we read them that way, aren't we then kind of stuck as a panel with that finding? No, because there was no request for judicial notice. There was no giving of judicial notice, and the jury absence, Special Agent Davis had absolutely no evidence from which it could infer that an iMessage text went over the internet to a receiver. Do some texts, I mean, my understanding is some texts don't go through the internet, some use the self-towers. Is that your understanding? It is, but again, there's no evidence. One way or the other. Most of the cases cited by the government from the circuit, you have experts. And so the argument is then that you, if that's right, what I just said, then you need some evidence of the internet, and the internet evidence was this FBI person who said, I went to a class. Yes. And I think the government might respond, well, that's part of his job, and he's a forensic examiner, and he does work with the phones, and he goes to FBI classes, and he learns this, and it's part of his job. What's your response to that? My response is that A, he was not noticed as an expert, and B, he had no personal knowledge of what he was testifying to, and C, under Rule 701, when it's specialized knowledge, scientific type knowledge, which this is, you don't have, unless you have personal knowledge, you need an expert. We have cases that don't require 702 testimony for things that people learn through their jobs and understand through their jobs. Why is that not? There was no evidence. He was a forensic. He would download information from phones. There was zero basis in the record to establish on any kind of basis. He would have personal knowledge as a result of his law enforcement experience rather than what he was told by an unknown professor at an unknown time about how iMessages travel. This may sound trivial, but to me, it'll just help me understand what you're saying. If I had to prove that a car went on the ground, and I put in evidence that the car was driven from one place to another, you wouldn't need an expert to say it was on the ground, because everybody knows that's how cars work. I don't think everyone knows that an iMessage sent from one iPhone to another in the same state travels over the internet. I think you need testimony. I guess that's what I'm trying to figure out, because when you said to Judge Aframe, you weren't sure whether it does go through the internet. What's our background knowledge we have to have to even answer this question? I'm a little bit puzzled. I confess to say I don't know the answer is an understatement. I think that's why in most of these cases, you have an expert or someone with personal knowledge to talk about, to provide a predicate for knowledge that it's the internet that transmits a particular text. At a minimum, we have to read Lewis to at least say that, that there's always got to be affirmative evidence that it traveled through the internet. What there doesn't have to be necessarily is anything saying that once it did that, that meant it went in interstate commerce. Turning to the absence of an entrapment instruction, O'Donovan is entitled to it. The evidence supported it. He sought it. He objected to its denial. The judge denied it. We have both the United States Supreme Court and Matthews and footnote two in this circuit. I don't understand what the inducement is. You say the inducement was on September 29, which is I think your best case of inducement. Basically, all that I saw happen was the thing he wanted, which was the money through the contract with the theory wellness, seemed to be at risk. He was willing to do the bribe. That's not overbearing. That's just presenting like, hey, this is really happening. Are you in or are you not? How is that an inducement? Well, before this series of the apex of the government scripted lies to Mr. O'Donovan, this case was lacking many of the essential elements of quid pro quo bribery. There was no offer of payment to the chief. There was no evidence that the chief in any way had communicated acceptance. More than once, the brother says to the defendant, the chief is on board. He knows I'm going to get something good out of this. I have financial problems. And the responses from the defendant each and every time when it's indicated that the chief understands there's money on the table are positive. Let's figure out how to make the payment to you. That's what happens prior to September 29th. September 14th is the first time that the FBI scripts a lie to say I have financial troubles, says the FBI informant, and my brother cares about it. There's no community. Is there something good in it for us? That was said even earlier. That was said in February in a very general way, and then the informant said that my wife came in and we didn't discuss it. But there's never a conveyance back to Mr. O'Donovan that the chief is even going to read the application with care, which is the ask. What's different here is over and over again, Mr. O'Donovan's ask is for the chief to do his duty. I guess when I watched all of this, I thought the ask was go talk to the mayor because what I, O'Donovan, am worried about is the swirl of politics around Medford are going to make it that the best candidate doesn't get it, and I need my guy, and my guy is going to be the chief, and I want the chief to talk and advise the mayor to go with theory wellness, and that's really what I want. If the chief scores the application high, if he advocates for the company on the merits, there's an official act to go to the mayor and additionally say, hey, mayor, I'm the chief, you should do this. And when you read the October 7 transcript or listen to the October 11, you know that Mr. O'Donovan is saying, I hope the chief will go to the mayor. It's always in terms if the chief scores the application high on the merits, and over and over, including September 14, and five times on April 26, Mr. O'Donovan is saying, tell Jack, tell the chief, if he doesn't like the application, if he doesn't believe the company merits what I'm seeking, forget it. Then we don't deserve it. Wouldn't it still be a bribe? I mean, suppose he calls up the chief directly and says, I know you're busy, and you might not pay full attention to everyone. Here's an extra $10,000, though. All I want you to do is make sure you read this one carefully and do what you would normally do if you had read it carefully. So I'm paying you the $10,000 just to get you to do your job normally. That'd be a bribe, wouldn't it? Well, for two reasons, it wouldn't. One, factually, there was never an offer of anything to the chief. I'm talking about this case. I'm talking about you don't, with paying someone to do something different than they would have done, even if the difference is to do their job right, is a bribe, isn't it? It would not, I would contend, breach honest services to the only people that are owed it, which is the people of the city of Medford. And two is that in this case, the indictment, paragraphs 19 and 26, require the communication of an agreement, a promise by the chief that he will, in exchange for the money paid to his brother, score the application high and advocate to the mayor. There was never any agreement conveyed to Mr. O'Donovan, who's, even as of September 14, is saying, I hope he will do things. On October 11, in the final tape, I hope the chief will score high. I hope he will go to the mayor. You need agreement. I mean, that's U.S. versus Fernandez one, where Judge Lopez's decision is affirming the instruction by the judge in the District of Puerto Rico, talking about an agreement. It's McDonough. You need more than a unilateral request, and you particularly need it more when there's no evidence. You need the chief to have agreed? To convey an agreement, whether or not he believed it or not. Whether, no, do you need the chief to actually have agreed? No. What you need is the chief conveying an agreement to the payor. The payor needs to believe that in exchange for the offer of payment, something will happen. We contend an official act. Right. So why in the, just taking the April 26 conversation, or at least what the evidence around it is, the evidence is that the brother says to the chief, there's something in this for both of us, correct? Yes. That's, I think, yes. And then when that's conveyed back to the defendant, that that message was conveyed to the chief, the defendant says, did you get a black eye? Yes. Why couldn't juries say you were presenting to the chief cash for the brother, which would the chief, and then the chief, rather than giving you a black eye, didn't give you a black eye, which made it think at that point, I guess we have a deal. I think it's highly speculative. The black eye is because he was, Mr. O'Donovan was told the chief hated cannabis. He hated being on the Cannabis Commission. And Mr. O'Donovan is constantly telling the brother, be careful how you speak to your brother. He's the police chief. I think the jury has to make various things, and maybe there's too many inferences in your view. But I guess I'm just trying to understand as a theoretical matter, is that exchange itself enough? In other words, the chief hasn't said directly, yes, I'm good to go. But the chief has, if the jury could conclude the chief left the impression that he was good to go, then that would be enough, right? You're not disputing that. No, I am disputing that there was ever a communication from the brother to Mr. O'Donovan that the chief agreed to anything, even agreed to read the application with care. What does the record show with respect to April 26, after the brother has said there's something for both of us? The defendant says, did you get a black eye? The brother presumably says no, or he can see he doesn't have a black eye. But what else is said in that exchange? The next thing said in that exchange is, you didn't really get a chance to talk about it. My wife walked in, and then Mr. O'Donovan says, here's what I'd like you to say to Jack, the chief. And five times he says, tell Jack if he doesn't like the application, then the company doesn't deserve it. There's some curse words. And that's the end. That's the ask. But there's never, until September 29, any kind of response from the chief as to whether he'll even read the application. So I understand how this then tracks the arguments. If the evidence at that point hasn't proved the actual bribe, why wouldn't it, and I think this is what Judge Affran may have been asking, why wouldn't it suffice to show, or maybe this is just a different point, why wouldn't it show enough of a predisposition at that point that it harms your contention that there was a problem with the entrapment instruction? Well, two responses. One is that unlike the normal sufficiency analysis where the benefit goes and the inferences go in favor of the winning party of the government, here it's the reverse. The entrapment decisions all say that when there's any conflict of evidence, that all plausible inferences should go in favor of the defense. Can I ask this question, which I think is related? Do we draw a hard black line at September 29 and say, when we think of a predisposition, it's everything that happened to that moment, because that's when the inducement happened? Is it everything up to the inducement that counts towards the predisposition? There was a stream of inducements, a stream of lies. They started earlier, September 14. When's the first one you think meets the plus factor? September 14, when the informant is told by the FBI to say to Mr. O'Donovan, oh, by the way, the popular former mayor is going to see the police chief, knowing that Mr. O'Donovan's my company merits the application, but I fear local influence, and that's why I'm hoping the chief likes the application and will be supportive of it with the mayor. When you review everything up to September 14, is what we think about when we consider whether there was any evidence that he wasn't predisposed? Yes, I can't make the argument that in April, there was inducements plus, but I would make the argument that in April, there is no beyond a reasonable doubt of predisposition, and there was no completed bribe. There was no money that was... You're also saying there's no evidence of predisposition from that exchange? Yes, predisposition to commit bribery, because that same day, he is not talking about any communication from the brother to the... What's our review standard for the decision not to give the entrapment instruction? Isn't it abuse of discretion? No, I respectfully suggest that all of the evidence is in the light most favorable to the defendant. The defense can plausibly support the theory. If there's any plausible evidence, and I think it is plausible from Mr. O'Donovan's perspective, when you have an indictment that requires an agreement, meaning the chief promised his agreement to do these things in exchange for the money that you were paying the brother. First of all, we're well outside the heartland of quid pro quo bribery. There's no other cases, very few cases where the money is not going to the public official. Second, the indictment... That can't be the distinction. Otherwise, people could just bribe the relative. It's bribe Joe by paying Joe's relative. In all the cases, the public official orchestrated the payment to the third party, rather. Yes, you don't need to put the money in the pocket of the public official, but in all the other cases... Orchestration by the public official isn't necessary either. I want to bribe the state auditor, so I call up and tell them that I'll pay the auditor's wife if the auditor does X. That's bribery. If it's an explicit exchange. In this case, there's hiring the brother, and I know it's not appealing, but the Porcaro case in the Supreme Court kind of says it's no different than hiring the chief of staff, hiring the former legislator. What do you do when you then know that the brother has broached the issue with the chief and told them there's something in it for both of us? It was so general, with the chief not responding, with instead the brother saying, but my wife came in and we stopped talking. I don't think you can extinguish an entrapment defense because they're joking about a black eye. But the relevant thing, if you agree that for the predisposition, he doesn't have to have committed the bribe already. There needs to be proof beyond a reasonable doubt that he's predisposed, and what I'm contending is... But the point of the predisposition that he's seeking the agreement is that the brother says there's something in it for both of us, and then when he says back, did you get the black eye? The fact that we don't know what the chief said in response, why is that relevant to the predisposition point? He's obviously, on that record, isn't there for the idea that he's hoping the chief is going to say, I agree. No, because O'Donovan never asked the brother to in any way communicate to the police chief there was anything in it for him. That's an FBI scripted lie. I thought that when he finds out what says, he says, thank you for talking to him. That was in 26. That's before there's any scripted lie at all. On February 10, O'Donovan starts, says, I want no favors. I want a fair shake. On April 26, he says, all I want your brother to do is to read the application. You can extract from their give and take on these video transcripts some snippets, but what you don't have is a compelling proof that O'Donovan wanted the brother to do anything illegal. He's asking him to be my lobbyist. I don't know the mayor. I know you know the brother. It's unappealing, but it's on the lobbying legal side before crossing to bribery. Our contention is it doesn't evolve into clear cut wrongdoing until these cascading escalating lies put- I don't understand my first question way back, which was inducement. You have something that you just said is very unseemly. Maybe it's- I'll give it to the benefit of the doubt. Maybe it's a bribe. Maybe it's unseemly lobbying. All the FBI does is say, all right, your contract's kind of at risk. Are you willing to do the bribe? And he says, yes, I am, essentially. So how is that the plus that we're talking about? There's not going after someone's family. This is not attacking a drug addiction. This is basically like, hey, the deal's going down. Do you want it or do you not? And he says, yes, I do. Why is that inducement? I don't see that. Because it's the escalating set of lies that, in Judge Lopez's words, in the most recent KUSV Perez Rodriguez, is entrapment can come from very subtle government pressure skillfully applied, which can amount to entrapment. So on September 14, he says, you need to worry about this AG issue. The FBI says to him, tell O'Donovan he needs to worry. The FBI says to the brother to tell him that the other people are using the ex-mayor to lobby. The FBI says to him, tell him that you need money, meaning you're vulnerable. The chief cares that you need money. And finally, he's saying that the chief didn't vote you out of the top three, which O'Donovan is surprised. This is a kind of escalating aggregate set of lies that changes Mr. O'Donovan from somebody that wanted to stay on the lobbying side of the line between advocacy and crime. But he's pushed over by the set of inducements. And the FBI shouldn't be able to do that. And, that everything they did was allowed, made it even more prejudicial than an entrapment instruction was not given to counterweight that. It's the aggregate of the lies that takes a lawyer with no criminal record, with no real proof of predisposition, and walks him across. And with all due respect, the throwaway, I'm happy your brother who hates cannabis didn't punch you because you even mentioned that I asked him to read an application carefully for a cannabis company is not sufficient to prove predisposition with such clarity that it extinguishes a defendant's right to a defense. Thank you. Thank you. Thank you, counsel. At this time, if counsel for the United States would please introduce themselves on the record to begin. Good morning, may I please the court, Dave Lieberman for the United States with me at United States attorney, Christina Barkley. Unless the court prefers for me to go otherwise, I will go straight to April 26 because I think that both informs there's a sufficiency challenge and Mr. Weinberg's entrapment claim. I first want to flag a threshold disagreement between the government and O'Donovan about what a bribe is. And this goes to, I think, one of Judge Kayada's questions. As I understand O'Donovan's argument, this is at page 32 of the the government had to show not just that he offered a bribe, but that he subjectively believed that the chief was in on the deal. And absent that no bribe. That is incorrect. Abdul Aziz, page 31, talking about core bribery, bribery offense includes the corrupt payment, receipt or solicitation. So that latter category does not require solicitation of what of the What is that? So in that case, it was a government or a government official asking for a bribe from somebody. So you don't necessarily need to have acceptance in that circumstance. They're not saying there needs to be acceptance. Yeah, I think I thought that they were unpaid. Now I will move on. The only thing he has to have intended to have an agreement. Yes, your honor. And with understand apologies for that misunderstanding. The evidence here on April 26 up till that point, ample evidence both to support that count one verdict and related to the entrapment that there was an offer to bribe with the intent. And your honor, you asked about what happens after the brother makes the comment. I talked to Jack. I talked to the police chief. The brother says this. I said to Jack, there could be something good for us with respect to marijuana committee. Conversation ended. I just don't know where to go. Jack doesn't know you're involved, you being O'Donovan. After that exchange, this is that 658 O'Donovan says, how do you think we should let Jack know who it is? At least he's not adverse to it. Right, brother? Again, he didn't say no. He didn't freak out in me. He didn't hit me. So that is we contend in found evidence of his intent to offer a bribe. It did not stop with the brother. O'Donovan intended for Jack, the police chief, to be in on it. That's also consistent with O'Donovan's statement. Same conversation, page 653. We need Jack to whisper back that they're good too. Further evidence, which the jury seemingly credited that this was not an unseemly lobbying effort to bring the brother into the fold. O'Donovan also intended to bring the police chief into the fold. Combine that with the many unseemly natures of the payment offer. It was all cash. Emphasis on secrecy. O'Donovan repeatedly says on the videos, he's worried about getting in trouble. This is April 26th and before that. And he's also doing this without his client's knowledge. And so this we contend is ample evidence of an intent to bribe the chief no later than April 26th. And that supports the count one verdict. Flipping to entrapment. Now, the panel engaged in an extensive colloquy with the elements of entrapment. J.H. Catt, I think this goes to a question that you asked in the earlier argument. What does that count one verdict mean? It means that the jury found in this case that O'Donovan had an intent to bribe the chief as of April 26th. What I think the force of it is they came to that conclusion without the entrapment instruction. And so the burden, if I'm understanding the defense counsel, flips for when we're reviewing a sufficiency challenge compared to whether we're reviewing whether there should have been an entrapment instruction. I agree with that, your honor. My point here is on the sequencing of dates. So the jury found that O'Donovan had offered this payment with intent to bribe the chief on an April 26th. At trial, at the charge conference, defense counsel asked for the entrapment instruction based on an improper government inducement. Many, many, many months later, September 29th, that was the date that he identified to the district court. So if the jury, we are now sitting after the fact with the verdict, the jury has found that O'Donovan had intended to bribe, had given the bribe offer as of April 27th. He, as a matter of law and common sense, could not have been entrapped five or six months later. So I understood there was a concession that there was no inducement until September 14th, and I understand you say there's a conviction April 26th. Does the jury get instructed, well, let's assume there was sufficient evidence after September 14th of entrapment. Do they get instructed, well, from this day on these counts, you could find he was entrapped, but because there was no evidence of inducement, you can't for this first count? How would that work? No, I'm actually speaking to this court as a court of review. This is, I think, the Vazquez-Rodriguez point, the Vazquez-Rodriguez decision from this circuit with respect to a duress instruction. On this record, this court knows that the jury found O'Donovan offered a bribe as of April 26th. So as a matter of law, he cannot be entrapped into that same deal five or six months later. And Vazquez-Rodriguez was a duress instruction, but it's an affirmative defense. Just to understand, that would just be a contention that the failure to give the entrapment instruction if error was harmless as the April 26 conviction? Yes, Your Honor. Yes. And so the point from Vazquez-Rodriguez is the defendant is not entitled to the duress instruction because at the time of the alleged duress, she had already joined the criminal conspiracy. The same principle applies here. The jury found that he had issued the bribe, there was only one bribe in this case, no later than April. He cannot possibly have been entrapped five or six months later. How did the counts, how did the honest services counts work with respect to dates? So there was count one, April. Count two, let me get this right, count two, October. And the honest services... So the one count to which this point would be, if I'm following it, this is not an argument though that necessarily says it was okay not to give the entrapment instruction. It just would be, it would be harmless as to the April 26 count. Correct. Correct. And then were there multiple convictions? There were two convictions on honest services, one on 666A. And the second one is an October count? Yes. So what's your, what do you do about the October? It goes back to the line of questioning. It at a minimum establishes predisposition. If the jury has found... If it does that, then we don't need to go through this rigmarole about the April 26 one, right? Yes, your honor, there's a bit of a chicken and egg. Okay. Yeah. In terms of like which claim to address. It comes down to that you're asking that the decision you're telling me is made on what the jury actually did. Yes. Not just looking at the facts sort of as we see them. It's the jury did this, therefore they know, they decided he committed a bribe as of April 26, therefore there's no predisposition. That's your... Correct, your honor. We, this court has the benefit... That can't make, here's why I don't track that. When we review that, we review for sufficiency whether their April 26 finding is sound. Correct? Correct. So now if we're trying to figure out whether there was predisposition in October, notwithstanding the conviction, don't we do a completely different review in which rather than doing everything in favor of the verdict, we do everything against the verdict? So I agree that in the normal circle... Then we're just trying to figure out, okay, but with respect to the October 14th count, was there predisposition? The evidence that suffices to show there was to support the conviction in April may not suffice to support not giving the instruction as to October. So at the very least, it's certainly relevant evidence that this court can consider in terms of that verdict? Well, the fact that the jury found that there's only one bribe in this case. You just look at whether the evidence is, the evidence is what the evidence is for predisposition under the standard you apply to determine predisposition, which I don't hear you disagreeing is beyond a reasonable doubt that he was predisposed. Yes. He either was or wasn't as of Let me go straight there. So first, Mr. Weinberg says it's September 14th. We think the operative date is September 29th. That's an affirmative defense that you have to raise in district court. And at the charge conference, that was the operative date. What do we have? I've already mentioned, we've started out with that April 26th evidence. I will also, I've also wanted to flag an exchange on September 14th. The brother flags the money and the quid pro quo. It says Jack and I are close. I told Jack I'm going to get paid. He wants to help me because I have financial issues. O'Donovan's response. Sure. Yep. You don't want it in a check, right? 669 and 670 of the joint appendix. All of this occurs before September 29th, the date of the alleged improper inducement. And so that in our view is clear evidence of disposition. Similarly, a couple other facts that I think are worthy of the court's consideration. This is not a case where the government agent was hounding Mr. O'Donovan. There was a four-month gap where the government, the brother had ceased all communication. April 26th and then fast forward to the late August. And it is O'Donovan who re-initiates conversations with the brother saying vote theory number one. And then those follow-on conversations. It's a rare, I can't find a case where there's an entrapment charge has been given where it is the defendant who is re-initiating contact with a government agent who says entrapped him. O'Donovan repeatedly expressed concern about getting in trouble. He repeatedly agreed to funnel the payments in ways for which they could be hidden after tax through a dummy consultant consulting agreement. And at the same time he's doing this, he's keeping his client in the dark. If this was a lobbying effort, an unseemly lobbying effort, then why is he still lying to his client? This is at Joint Appendix 320, saying we're hiring the brother as a security consultant. So line all this up, Judge Afermead, it sounds like you've watched the videos and the court will see that on September 29th and on every day before that. Those are all good arguments. I understand them all. Those are factually, I think, correct. But they would say, yes, an intermix in all that is some ambivalence about the chief, about how he feels about these things. We've got to, you know, being careful. Don't, you know, there is all of that in there too. So under the standard that we have here, which is unfavorable to you, why isn't it so? Yeah, it's mixed. And if it's mixed, the judge should have let the jury decide with the proper instructions. No, not a primification case, even under this standard, because all of the relevant points on the agreement, what it is, and all these predisposition evidence, it all comes in before September 29th. Everything is in place before September 29th. And that is the sequencing point that I want to stress. If it's all in place before the date of the alleged entrapment, defendant cannot be entrapped. What do you think of September 29th? Do you think that's enough to be an inducement? No, Your Honor. And my response would be to, I think the court can watch the videos, and it will see that at no point did the brother do anything else but offer the ordinary opportunity to commit a crime. If I might, on the interstate issue. Yes. I had a couple of questions. Is there any admitted evidence in the record as to whether or not Apple has a server in Massachusetts? And is there any evidence in the record as to whether if it has a server in Massachusetts, an iMessage from one person in Massachusetts to another would have gone beyond that server outside the state? Your Honor, there's no evidence in the record about where Apple keeps its servers. So if there's no evidence as to whether or not Apple has a server in the state, and there's no evidence as to whether it would go out of state or not if Apple did have a server in the state, how can we find, how could a court find that the communication went outside Massachusetts? So as I understand, five published... I just don't know. So five published decisions from this court have said if it goes through the internet, the jury can find that the message, the photograph was transmitted in interstate commerce. I should have made clear, I've just asked this on a blank slate. Perhaps the precedent will force us to go otherwise, but I'm just trying to understand how a court could say without expert testimony that it went outside of Massachusetts, if we don't even know if there was an Apple server in Massachusetts, and we don't even know what that would mean. So it sounds like a prior panel knew a lot more about the internet than we do, perhaps. It was earlier. Let me work off the blank slate and then return to the case law. So the blank slate, at least, is that the Supreme Court told us in 1997, and this court repeated those statements in Lewis, that the internet is an interconnected network of computers that has no geographic distinctions. So there's no main internet, there's no Massachusetts internet, there's no New Hampshire internet, there's just the internet, or I think we would call it... This is a proprietary, at least as I understand it, although of course there's like no evidence at the trial whatsoever, but this is a proprietary Apple situation, right? My phone somehow is sending it to your phone. They're both Apple. It's indicated because it's a blue square, not a green square. I know that, but that's not in the record. So how do we know how that works? Is that this internet that the cases are talking about, when it's a proprietary Apple system? The evidence that we are relying on is that iMessages travel over the internet. That was the testimony at trial. The jury could supportably credit that, and that is enough under this court's case law to meet the jurisdictional hook. What's the knowledge base of the expert who said that? So this is the FBI testimony, so he didn't come in as an expert, and the district court, in the fair exercise of his discretion, said that this did not have to come in under Rule 702. Why is there 602? He just said, I went to a class and they told me, and now I'm telling you. How is that not hearsay? So that was on cross-examination. I believe in the direct, it was just generally he took 400 hours of classroom training about phones that had hands-on experience. He had himself personally examined 100 phones in his position. Does that tell on how the messages got there? So I mean, the cross-examination, which was effective, ended him saying, the only reason I know this is I went to a class or classes and they said this. It sounds like I'm not an expert, but an expert told me this, so I'm telling you. That's what it sounds like. So the test from this court is, could the district court have reasonably find that the take that testimony, combined it with the officer's testimony about his qualifications, 400 hours of training about phones, cell phones, and the district court, in the exercise of its discretion, could infer that this witness knows about iPhones. That initial testimony went no further than, I took a lot of classes and I know how to do a cell bright. That was the initial test. Yes, Your Honor. You never saw it going over the internet. Yes, Your Honor, and this is where our citation to the Neal case, I think, is responsive. So in Neal, that was the bank employee who testifies, my bank is FDIC insured, it services out-of-state witnesses. And this court said she had personal knowledge under 601. No, the standard. Sorry, Judge Barron. Judge Card, I think, was saying he didn't see it go over the internet. No, he said that, correct, he said that he knows that. Then the question is, how do you know it? One way, well, I saw it. That's kind of hard, given what we're talking about. What it sounds like, he said, is I know it because somebody told me. I would say, on top of that, I know it because this is my job. I'm a phone examiner. I think that's a fair inference from the record. Those cases that talk about, it's my job, they say, and there's a basis for cross-examination based on what you do in your job. So in Neal, that person's working with the records. There are questions to ask the person about those records. What was Mr. Weinberg supposed to ask this FBI examiner, other than, well, I learned it in a class, and I'm telling you now? What was he supposed to ask him? The record shows that he worked with phones. He knows how smartphones operate. This is not a secret. This is not the highly specialized technical knowledge. That was, I think, sufficient under this court's minimal What's the difference between a green and a blue box on an iPhone? Do you know? I'm sorry? What's the difference between a green text and a blue text? Do I personally know? Right. Some are on messages, some are not. I take your point. Yes. But on this record, the district court had enough to find personal knowledge. And I want to just flag a question that you asked, Mr. Weinberg. The objection below was a 702 objection. And so before the guy testifies, he says, this guy doesn't have personal knowledge. I was told about him after midnight last night. Judge Young says, well, we'll see what happens. The direct happens. Then in the middle of that, Mr. Weinberg says, well, this needs to be 702. Judge Young says no. Then the cross-examination is all about personal knowledge. Then he says at the end, move to strike. And Judge Young says denied. You don't think he's made clear that there's a personal knowledge problem? I understood the record that it was a 702 objection that he raised before Judge Young, and Judge Young denied it. And I think under this court's lenience standards for 601, that this was enough for this witness to have testified personal knowledge. Apple messages travel over the internet. Final point, this goes to a question I think started me out on the plain blank slate. If I could just reference Lewis. So Lewis, page, I think it's 208, 209 of Lewis. The court notes a government expert there conceded that the Limewire file transfer, any Limewire file transfer, which was the type of file at issue in that case, could have remained entirely within one state. So the court flags that. It nevertheless affirms the defendant's convictions finding sufficient evidence of an interstate wire based on the sole proposition that this court has said five times. If it goes up on the internet, the jury can supportably find the interstate commerce element satisfied. Let me conclude just so I button down this one point. If we concluded that the personal knowledge challenge was preserved and that he didn't have personal knowledge of this thing, then there would be no evidence that it was on the internet at all. Correct. And I take it you agree at that point it would be reversible error and you have to vacate. Yes, your honor. We have if it is preserved, which we have disagreed with, we did not make a harmless error argument with respect to a preserved error. Before you sit down. Yes. On 666 in Snyder, the Supreme Court said, I think, 11 times that there's an official act requirement. Now, I understand that was not the issue in Snyder. What's the government's position post Snyder on whether 666 requires an official act? Our position is it does not require a McDonald type official act. We think the court in Snyder was using that as shorthand for 66682's fairly language about business transactions or series of transactions. And I think that's also consistent with Snyder's. I don't agree with you. What's the official act that you say the chief that was sort of O'Donovan believed was being agreed to do? So that was the chief favorably ranking the client's and then making a positive recommendation to the police chief. And in McDonald itself, it cited a case called Burdall or Beardall, which involved a similar factual circumstance, bribes to somebody who is in charge of making recommendations to the ultimate decision makers. Final point on this harmless error, the jury got a McDonald official act instruction on counts one and two. And so it found in a McDonald official act, the government's theory was the same. There's only one bribe scheme. So we know what the jury would have found. Do we look at that from what we know a particular jury did versus do we see the facts meeting whatever the harmless errors stand? I think in jury instructions that I think this would be absolutely fair game. So I know there are many other counts and claims in this case. Before I sit down, I just want to ask if the court would like me to address anything else. Thank you. We'd ask that the court affirm. Counsel at this time, would counsel for the appellant, please reintroduce himself on the record to begin. Martin Weinberg for appellant O'Donovan. I would urge the court if it's considering the official act issue to look at page six and seven and eight of the Snyder slip opinion, where the Supreme Court talks about how 666 was modeled after 201B, which does have an official act element. There's a reason why the text didn't include it, which is 666 is not just for public officials. It also embraces agents of entities other than state or local government, but there's simply no reason why 666 should be a broader criminal statute for prosecuting state and local officials than 201B, which is the statute for prosecuting federal officials. We've written a lot about it and I won't further burden it with the limits of time. Two is on the April 26th count, not only is the unit about this import of whether there is an official, whether there is an official act element or not, does it, they were instructed to find an official act or are you saying they were not? They were, they were not originally, there was an objection. Judge Young was convinced to instruct them on the amount of services count, but over the, he agreed with the DOJ. The government's arguing the evidence suffices to show an official act. They argue that it suffices to show it. And the thing they're saying is an official act you agree is an official act. There was an official act in terms of a recommendation, a proposed recommendation. You're not disputing that not disputing that insufficiency. So why does the official act and what Snyder says about it matter in this case? Because the honest services counts that the official act was part of the instruction are flawed for other reasons, the interstate commerce. But the official act issue just isn't really being, is there some dispute about the official act that matters to the case? There's not a strong dispute that if the court finds the other elements that the official act was met, but the judge didn't instruct. In terms of count one, which is the 426 count, you know, it is the proof of that count was insufficient for a number of reasons. One is that the message was, I'm working hard. Now, O'Donovan was working on a daily basis, talking to Pollack on a daily basis that had no capacity to further or be important to the execution of the wire fraud. Two is that as of April 26th, when you compare it to the charges of the indictment to paragraph 26, O'Donovan reached what he believed to be a corrupt agreement with the chief and with individual one under this agreement, O'Donovan intended to offer the chief a payment through his brother in exchange. And this is what was lacking on April 26th. It makes it that there was not a sufficient basis to prove honest services crime on April 26th in exchange for a, the chief's agreement to provide a formal, formal ranking of the client's application. The chief hadn't even conveyed that he agreed to read it by April 26th, much less score it high. That came alone on September 29th. And the second was the chief's agreement to advise and pressure the mayor that was never conveyed as an agreement. You hear the tape, the chief had agreed to the, to the other side, not whether a bribe was offered. You're under the indictment and under the case law and Fernandez, you need more than just an offer. Maybe that's an attempt, but in order to have a quid pro quo exchange, you need some conveyance scheme to do the thing. It's not a scheme to complete the thing. The thing is to offer the bribe. That seems to be the scheme, but why do you need the other side of the scheme? Because otherwise it's an attempt and it could be construed as a gratuity, but then why you're a wire fraud? We don't require that you succeeded in the scheme. You're guilty because you tried to do the scheme. It's here. You have an indictment that requires an conveyance of an agreement, a belief saying that he needs to have acceptance of the agreement. You have to say conveyance of the agreement. So I guess if I'm understanding your point, you're saying what was conveyed could not have been the agreement identified in the indictment because there wasn't enough specificity in what the April 26th evidence shows about what was being communicated to the chief. Is that the idea? Not only on April 26th. Let's just stick for April 26th for a second. Until the September 29th, there's no conveyance that the chief has agreed to anything. Okay, but you just said it in a funny way. There's no conveyance that he's agreed to anything. No communication through the brother that the chief says, I'll read the app, not even saying, I'll read the application. I'll vote on it and its merits. There's no communication. I'm guilty if I say to the chief directly, I will pay you $10,000 if you talk to the mayor and recommend my client. And the mayor says, and the chief says, I will not do that. Am I innocent? You're not committing the crime charged in this indictment and you're not committing with all due respect the 666 program's bribery. It may be an attempted charge that you can be prosecuted, but it's not a completed exchange of an offer of payment in exchange for a quo, the quid pro quo. You're lacking the quo. It's simply an offer. Thank you. Thank you, counsel. That concludes argument in this case.